IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:17CR154 |
| vs. | **AMENDED FINDINGS AND RECOMMENDATION** |
| LAWRENCIA MERRICK, | |
| Defendant. | |

This matter is before the Court on the Motion to Suppress Evidence (Filing No. 75) filed by Defendant, Lawrencia Merrick. Defendant filed a brief (Filing No. 76) in support of the motion and the government filed a brief (Filing No. 81) in opposition.

The Court held an evidentiary hearing on the motion on October 31, 2017. Defendant was present with her attorney, Dana Bradford. The government was represented by Assistant United States Attorney, Lecia Wright. FBI Special Agent (SA) Bradley J. Purscell testified on behalf of the government. Exhibits 1 and 2 were offered by the government and received by the Court without objection. A transcript (TR.) of the hearing was prepared and filed on November 7, 2017. (Filing No. 108). The matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that the motion be denied.

## BACKGROUND

SA Purscell testified that he has been employed with the Federal Bureau of Investigation (FBI) for over twenty-one years. He has a college degree from Iowa State University and completed sixteen weeks of training at the FBI academy. Prior to his employment at the FBI, he was an Army officer. (TR. 5-6). He is involved in criminal investigations within Indian Country in the District of Nebraska, covering the Santee Sioux, Winnebago, and Omaha Nation. (TR. 6).

On April 23, 2017, at approximately 10:00 a.m., SA Purscell received a call about a body discovered in Winnebago. The call was from Winnebago Police Chief, Jason Lawrence. William Redhorn's body was found face down in the grass on the slope of a small hill of the front lawn of the Ho-Chunk Building. There were indications of trauma to the face and blood was present. (TR. 6-7). Apparently, a churchgoer had called the police to report the body. Chief Lawrence then called the FBI. Redhorn's body was identified by two relatives. SA

Purcell spoke to Redhorn's mother, who indicated that he had been drinking and had left her home in the early morning hours on April 23, 2017. (TR. 8).

At approximately 9:00 p.m. on April 23, 2017, Chief Lawrence was called by an off-duty Winnebago officer, Sergeant Gordon Rave. (TR. 16). Sergeant Rave stated that he was mowing his grass at his residence when he was approached by two individuals, Defendant and Jeremiah Wolfe "(Jeremiah)", and that Jeremiah said they wanted to make a statements regarding the case they were investigating. Sergeant Rave then informed them that it was best to go to the police station. (TR. 16). Defendant and Jeremiah arrived at the Winnebago Police Department and SA Purscell introduced himself. The building is dedicated one half for fire and rescue, and one half for police operations. The police operations include the hallway, area for the dispatcher, and offices. Defendant was not escorted to the building, nor was she handcuffed upon arrival. (TR. 9-10).

SA Purscell conducted an interview of Defendant. The interview lasted over an hour and was audio recorded. Defendant had a cooperative demeanor during the interview, although she was nervous and cried at one point. At no time during that evening was she placed in handcuffs or restrained, and the interview room was closed but not locked. SA Purscell told Defendant that she was free to leave during the interview, and at no point was she in custody. SA Purscell did not provide Defendant with *Miranda* warnings because she was not in custody and was told she was free to leave. SA Purscell spoke conversationally during the interview and never raised his voice nor made any promises of benefits. SA Purscell did not have a prior knowledge of Defendant. After interviewing Defendant, SA Purscell interviewed Jeremiah. (TR. 10-14).

At the time SA Purscell interviewed Defendant, an autopsy of Redhorn had not been performed and thus the cause or manner of Redhorn's death had not yet been determined. (TR. 13-14). At the end of Defendant's interview, SA Purscell asked Defendant for her consent to retrieve clothing from her residence that she shared with Jeremiah. (TR. 14). SA Purscell followed Defendant and Jeremiah to their residence on the Winnebago Reservation after Jeremiah's interview concluded. (TR. 14). Defendant and Jeremiah retrieved the clothing from the residence and SA Purscell provided them with a receipt. SA Purscell then left the premises. On April 24, 2017, Defendant and Jeremiah were arrested on tribal charges from the Winnebago Tribe. (TR. 15).

On cross examination, SA Purscell testified that the call on the 23rd came in at about 10:00 a.m., and although he later left to handle another call, he did come back. When he returned, SA Purscell spoke with Chief Lawrence and at that time there were no suspects with regard to the incident. An autopsy had been scheduled for the next day. (TR. 18-20). SA Purscell further testified that the call from Sergeant Rave came in about 9:00 p.m. concerning the two individuals and their desire to make a statement about "the case." The statements were about the recovery of the body, but SA Purscell was not sure if the individuals were witnesses or perhaps involved in the incident. (TR. 20-22). SA Purscell further testified on cross examination that the interview room door was closed, but not locked, that he did not perform a rights advisory because it was a non-custodial interview, and that Defendant was free to leave. (TR. 22).

The government argues that Defendant was not in custody and, therefore, this was not a custodial interview requiring the advisement of *Miranda* warnings. The government further argues that Defendant was, in fact, allowed to leave at the conclusion of the interview. (Filing No. 81; TR. 24-25). Defendant argues that once the information came out during her interview, the nature of the interview changed and became an interrogation requiring *Miranda* warnings. Defendant further argues that the environment surrounding her interview shows that she was in custody. Namely that the interview took place in a room used for questioning and that the interview was recorded. Additionally, Defendant argues that although she may have had a right to leave, there was no intent for her to leave. (TR. 25-26). Given the questioning of SA Purscell, Defendant also argues that the subsequent attempt to interview Defendant preceded by *Miranda* warnings is indicative of the necessity of the *Miranda* warnings during the interview on April 23, 2017. (Filing No. 76). Defendant seeks suppression of any statements she made during her interview, any police report of the interview, and any diagram attached to the report. (Filing No. 75; Filing No. 76).

## ANALYSIS

Evidence obtained by the police during custodial interrogations cannot be used in court during trial unless the defendant was first informed of the right not to incriminate herself and the right to a lawyer. *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). It is undisputed that Defendant was interrogated at the police station on April 23, 2017, and that she was not provided

with *Miranda* warnings. The question before the Court then is whether Defendant was in custody during the interrogation, thus making her incriminatory statements inadmissible at trial. To determine "whether a suspect is 'in custody'" a court examines "the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a 'reasonable person in the suspect's position would have understood his situation' to be one of custody." *United States v. Laws*, 819 F.3d 388, 396-97 (8th Cir. 2016)(quoting *United States v. Griffin,* 922 F.2d 1343, 1347 (8th Cir. 1990)). Factors indicating custody include:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Id.* at 397. Although the defendant in *Laws* was handcuffed, had not initiated the interview, and was not free to move around in a police dominated atmosphere, the Eighth Circuit nevertheless affirmed the denial of the defendant's motion to suppress. The defendant's interview was short in duration and the defendant was not arrested when it concluded. "Most importantly," the Eighth Circuit cited the fact that the defendant and all occupants of the house were advised they were free to leave after the defendant was uncuffed and before the defendant made any statements. "[A]n explicit advisory that an individual is free to leave generally 'weigh[s] heavily toward a finding of non-custodial status.'" *Id.* (quoting *United States v. Elzahabi*, 557 F.3d 879, 884 (8th Cir. 2009)).

Applying the factors set forth above, the undersigned magistrate judge concludes that the interrogation of Defendant was non-custodial. Although the interview was perhaps "police dominated," Defendant was explicitly informed that the interview was voluntary and that she was not under arrest. SA Purscell told her, "So you're going home tonight, we're just talking right now," and, "So, what we're doing here is voluntary and I've told you before you're free to go when we're done." (Ex. 2 at page 13, 24). The record also contains no evidence that Defendant was restrained. Moreover, Defendant voluntarily initiated contact with law enforcement and agreed to come to the police station to make a statement. The record contains

no evidence that Defendant was threatened or was made promises, and she was permitted to leave after the conclusion of the interview. Simply put, Defendant was not in custody when she voluntarily appeared at the police station for an interview and left when it concluded. Thus, no *Miranda* warnings were required.[1]

Because SA Purscell conducted a non-custodial interrogation of Defendant on April 23, 2017, her statements were not obtained in violation of the Fifth Amendment and are admissible during the trial in this matter. Accordingly,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Robert F. Rossiter, Jr., that Defendant's Motion to Suppress Evidence (Filing No. 75) be denied.

Dated this 15th day of November, 2017.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

### ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

---

[1] Nonetheless, SA Purscell was aware that Defendant intended to give a statement about Redhorn's death, which certainly could be incriminatory, and his questions could and did lead to incriminatory responses. Defendant indicated that she was scared to come there (Ex. 2 at page 19), and that she and Jeremiah were thinking about turning themselves in for doing something bad. (Ex. 2 at page 22). A *Miranda* rights advisory under such circumstances constitutes a best practice in upholding the right against self-incrimination, protects against Fifth Amendment violation allegations, and aids in the administration of justice.